920 P.2d 1046

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Danny A. PADILLA, Defendant–Appellant.**

**No. 16430.**

Court of Appeals of New Mexico.

May 20, 1996.

Certiorari Denied July 3, 1996.

Tom Udall, Attorney General, Joan M. Waters, Assistant Attorney General, Albuquerque, for Appellee.

Douglas W. Baker, Ann Arbor, MI, for Appellant.

*OPINION*

BOSSON, Judge.

1. In this appeal, we determine whether under the aggravated burglary statute, NMSA 1978, § 30–16–4(B) (Repl.Pamp.1994), a defendant "arms himself with a deadly weapon" when he steals a knife during a burglary but does not use or threaten to use that knife as a weapon. We also discuss the risks in using a showup identification as evidence, particularly when the accused is not positively identified at trial by that witness. Finally, we discuss summarily a comment by the prosecutor on Defendant's failure to testify when defense counsel opens the door. We affirm.

*FACTS*

2. The facts are not in dispute. During the early morning hours before first light a witness saw someone in the used car lot across the street from his house. The witness then saw the suspect leave the car lot on foot heading toward a nearby railroad overpass. The police were contacted and informed of the suspect's general appearance and his direction of travel. Shortly thereafter, a police officer approached the overpass and observed a person trying to board a moving train who matched the suspect's description. It was Defendant. The police placed him under arrest for other outstanding charges and searched him. In Defendant's pockets the police found two small pocket knives and five car keys. Defendant was carrying a white plastic trash can in which the police discovered several beer cans and a "large hunting knife" with a "green camouflage handle" in a "camouflage sheath."

All these items, including the knife, belonged to the automobile dealer and were positively identified as fruits of the burglary. Shortly thereafter, the police took Defendant to the car lot, where the witness identified him as he sat in the back of the police car. Defendant was convicted of aggravated burglary as well as unlawful taking of a motor vehicle and criminal damage to property under $1000.

### Did Defendant Arm Himself With a Deadly Weapon During the Burglary?

■ 3. The aggravated burglary statute, Section 30–16–4, reads as follows:

> Aggravated burglary consists of the unauthorized entry of any vehicle, watercraft, aircraft, dwelling or other structure, movable or immovable, with intent to commit any felony or theft therein and the person either:
>
> A. is armed with a deadly weapon;
>
> B. after entering, arms himself with a deadly weapon;
>
> C. commits a battery upon any person while in such place, or in entering or leaving such place. .

We are concerned only with subsection B. The facts show Defendant never used or threatened to use the hunting knife as a weapon but only carried it in the portable plastic trash can with the rest of the stolen goods. Defendant's factual contentions are not in dispute. The question is whether it makes any difference how the knife was actually used. Recognizing the force of precedent against him, Defendant asks us to overrule *State v. Luna*, 99 N.M. 76, 653 P.2d 1222 (Ct.App.), *cert. denied*, 99 N.M. 148, 655 P.2d 160 (1982), or limit it to its facts.

4. In *Luna*, this Court construed the same aggravated burglary statute and held that a burglar "arm[ed] himself with a deadly weapon" under Section 30–16–4(B) when he carried away unloaded guns as part of his theft without attempting to load the guns or otherwise use them as weapons. *Id.* 99 N.M. at 77–78, 653 P.2d at 1223–24. The legislature could reasonably aspire to deter potential violence by punishing even the bare possession of guns during the commission of a crime regardless of whether the guns were loaded or how they were used. *Id.* at 77, 653 P.2d at 1223.

5. There is a self-described split among the states. The majority follow *Luna*, holding that stealing weapons during a burglary is enough to support the aggravated enhancement without any requirement of proof that a defendant used them as weapons. *See Pardue v. State*, 571 So.2d 333, 333–35 (Ala. 1990); *Wesolic v. State*, 837 P.2d 130, 133–34 (Alaska Ct.App.1992); *People v. Loomis*, 857 P.2d 478, 481–82 (Colo.Ct.App.1992), *cert. denied* (Aug. 30, 1993); *State v. Merritt*, 247 N.J.Super. 425, 589 A.2d 648, 650–51 (App. Div.), *cert. denied*, 126 N.J. 336, 598 A.2d 893 (1991); *State v. Hall*, 46 Wash.App. 689, 732 P.2d 524, 527–28, *review denied*, 108 Wash.2d 1004 (1987); *Britt v. State*, 734 P.2d 980, 982–83 (Wyo.1987). While most cases involve guns, loaded or unloaded, and some involve statutes that require actual or threatened use for weapons other than guns, *see Wesolic*, 837 P.2d at 133; *Hall*, 732 P.2d at 527; *Britt*, 734 P.2d at 981, others specifically include knives. *See Loomis*, 857 P.2d at 480. On the other hand, a minority of jurisdictions rely on specific statutory language to require that a defendant must use or threaten to use even a gun as a weapon. *See State v. Befford*, 148 Ariz. 508, 510, 715 P.2d 761, 763 (1986) (en banc) (applying Arizona statute linking dangerous weapon to "circumstances in which it is used"); *cf. State v. Herkshan*, 105 Ariz. 394, 395, 465 P.2d 587, 588 (1970) (holding that a person is "armed" with a deadly weapon when such weapon is within his immediate control and available for use in the crime). We note that *Befford* has been supplanted by a legislative enactment, made in response to that decision, clarifying its intent that "armed" means to "knowingly possess." *See State v. Tabor*, 184 Ariz. 119, 120, 907 P.2d 505, 506 (App.1995).

6. We are not inclined to retreat from our holding in *Luna*. That case has been expressly followed by other jurisdictions and has become an inextricable part of the fabric of the law nationwide on this subject. *See Pardue*, 571 So.2d at 334–35; *Loomis*, 857 P.2d at 481; *Merritt*, 589 A.2d at 650; *Britt*, 734 P.2d at 982–83. We would need a com-

pelling reason to reverse or limit it at this late date. The New Mexico Legislature has been on notice for almost fifteen years since *Luna* of how we construe the phrase "arms himself with a deadly weapon," and there have been no reported changes in the statute since then. *Luna* seems to fit comfortably within legislative intent. If anything, *Luna* seems more appropriate today than ever before. Nearly fifteen years ago our Court observed: "Crimes involving violence or use of firearms are among those most abhorrent to our society. The rising number of offenses wherein firearms have been used or victims assaulted with deadly weapons was obviously an important factor bringing about the passage of the aggravated burglary statute." 99 N.M. at 78, 653 P.2d at 1224. Can anyone doubt the relevance of these remarks for today's society?

7. Moreover, unlike some other jurisdictions, apparently New Mexico has never restricted the definition of a "deadly weapon" to its actual use, but has relied instead on the kind of weapon and its inherent potential for harm. *See* NMSA 1978, § 30–1–12(B) (Repl. Pamp.1994) (defining deadly weapon to include "any other weapons with which dangerous wounds can be inflicted"); *see also* SCRA 1986, 14–1632 (Use Note, No. 3) (Uniform Jury Instruction for aggravated burglary providing alternative definition of deadly weapon to include " 'an instrument or object which, when used as a weapon, could cause death or very serious injury' "). *See generally State v. Martinez,* 57 N.M. 174, 176, 256 P.2d 791, 792 (1953) (holding that even small knife with two-inch blade could be considered deadly weapon depending on actual use); *Territory v. Armijo,* 7 N.M. 571, 577–78, 37 P. 1117, 1118 (1894) ("Any knife may be so used as to become a deadly weapon, but all knives are not in law 'deadly weapons[,]' " depending on "the kind and character of the knife."); *see also Meadows v. Commonwealth,* 551 S.W.2d 253, 256 (Ky.Ct.App.1977) (showing character of weapon as deadly may be question of law, but where its deadly character depends on use, it becomes question of fact for jury).

8. There is no dispute that the knife in question qualifies as a deadly weapon despite its lack of use. We reaffirm our holding in *Luna* that Defendant became "armed" with that knife the moment he took it regardless of how he may or may not have used it.

9. Defendant further argues that he could not have been "armed" with the knife because it was not on his person; it lay in the plastic trash can in which he carried away other items from the burglary. We recognize that, in the abstract, a person's constructive possession of a weapon might be so remote, for example, in storage at another location, that one could not be "armed" with it under any reasonable interpretation of the term. But that hypothetical is not this case.

10. Many of the opinions previously cited have adopted a working definition of "armed" to include a stolen deadly weapon which is "easily accessible and readily available for use" during the commission of the burglary whether or not it is actually on the person of the accused. *See Wesolic,* 837 P.2d at 133–34; *State v. Romero,* 135 Ariz. 102, 105, 659 P.2d 655, 658 (App.1982); *Loomis,* 857 P.2d at 482; *Merritt,* 589 A.2d at 650; *State v. Speece,* 56 Wash.App. 412, 783 P.2d 1108, 1111 (1989), *aff'd,* 115 Wash.2d 360, 798 P.2d 294 (1990) (en banc); *Hall,* 732 P.2d at 528; *Britt,* 734 P.2d at 982. This definition enhances the policy goal of deterring violence in that it discourages having a deadly weapon available for use during a crime. It has a certain pragmatic efficacy in that it avoids the complications of legal terminology like "possession" or "constructive possession." *See Merritt,* 589 A.2d 648; *cf.* SCRA 1986, 14–130 (Uniform Jury Instruction defining possession).

11. We adopt this definitional phrase to be used with our aggravated burglary statute. In *Luna,* the defendant was armed because he had the guns, albeit unloaded, "easily accessible and readily available for use" as he gathered them up from the burglarized store and took them away. 99 N.M. at 77, 653 P.2d at 1223. So, too, a jury could find here that Defendant had to handle the knife during the commission of the burglary to place it in the trash can. That is enough under Section 30–16–4(B). Continuing thereafter, he had the knife "easily accessible and readily available for use" when arrested.

Even if the knife had not been accessible and had been locked up elsewhere, Defendant still would have been subject to conviction under Section 30–16–4(B) because the knife was "easily accessible" during the burglary. *See Hall*, 732 P.2d at 528.

12. In light of our construction of the statute, we hold that Defendant "armed himself with a deadly weapon" during the burglary in question and was properly convicted for aggravated burglary.

### Comment on Defendant's Silence

█ 13. In the rebuttal stage of final argument, the prosecutor urged members of the jury to use their common sense and draw logical inferences connecting Defendant's possession of stolen items at that time and place, with the likelihood that Defendant must have committed the burglary. The prosecutor was responding to Defendant's final argument that it was sheer speculation to infer the crime of burglary from the mere fact of possession. The prosecutor stated: "There's no testimony that [the stolen goods] fell on the ground and [Defendant] just, by the stroke of luck, happened to come upon these particular items." Defendant elected not to testify in his own defense. Although Defendant did not object at trial, he now contends that the prosecutor was commenting on his right to remain silent which is prohibited by the Fifth Amendment to the United States Constitution.

14. We agree that a jury might conclude from these remarks that if Defendant had an explanation for how he came to possess the stolen goods, then he would have given it, and it follows logically that since Defendant did not testify and provide such an explanation, then he must be guilty. *See United States v. Barton*, 731 F.2d 669, 674 (10th Cir.1984) (holding prosecutor's comment on missing explanation where it could only have come from the accused constituted an impermissible comment on Fifth Amendment privilege); *State v. Garcia*, 118 N.M. 773, 777–79, 887 P.2d 767, 771–73 (Ct.App.1994), *cert. denied*, 119 N.M. 168, 889 P.2d 203 (1995); *State v. Hennessy*, 114 N.M. 283, 285–90, 837 P.2d 1366, 1368–73 (Ct.App.), *cert. denied*,

114 N.M. 82, 835 P.2d 80 (1992). Ordinarily, this would be very troubling indeed.

15. However, in this instance the prosecutor was merely commenting on what Defendant had already invited. During Defendant's final argument, while pleading with the jury not to speculate, defense counsel stated: "At the most that shows us he was in possession of this property then," referring to the time of the arrest. Counsel continued: "Where he got it, where he could have gotten it, we didn't hear his testimony, we don't know." Defense counsel opened the door, trying to use his client's silence for tactical advantage. The prosecutor did no more than respond in kind and in measured tones to what defense counsel had already brought up before the jury. Fundamental fairness must allow the prosecutor reasonable latitude under these special circumstances. The situation is sufficiently analogous to *United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 869, 99 L.Ed.2d 23 (1988), where the Supreme Court observed:

> Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin [v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) ] holds that the privilege against compulsory self-incrimination is violated. But where as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege.

Under these circumstances, we conclude there was no violation of Defendant's Fifth Amendment privilege and therefore no error.

### Ineffective Assistance of Counsel—Showup Identification

█ 16. After observing the burglary from across the street, the witness gave police a description of the suspect's clothing (there is no evidence that he could identify his face) and told them that he had just run off toward the railroad tracks. He also may have indicated that the suspect was Hispanic. Shortly thereafter, the witness was informed that the police had caught the man, and the police soon appeared with Defendant in the

back of a police car. The witness was asked whether he could identify Defendant as the burglar, and he did so. This is called a showup identification.

17. At trial, the witness testified to the showup identification. However, when he was asked to pick out the burglar in the courtroom, the witness was unable to do so. Despite the witness's attention being specifically directed to Defendant (Defendant was asked to stand and face the witness), the witness could not identify Defendant as the burglar. The witness would only concede that Defendant resembled the man he had identified at the showup. When asked repeatedly if the man he had identified at the showup was in the courtroom, the witness looked straight at Defendant and replied more than once: "I don't see him."

18. Defendant never objected to the showup identification. Defendant now claims his counsel was ineffective for not objecting, especially in light of the witness's inability to identify Defendant at trial. There were no other eyewitnesses.

19. Defendant asks us to reexamine New Mexico precedents like *State v. Maes,* 100 N.M. 78, 665 P.2d 1169 (Ct.App.1983), and *State v. Torres,* 88 N.M. 574, 544 P.2d 289 (Ct.App.1975) in light of cases elsewhere, such as *People v. Riley,* 70 N.Y.2d 523, 522 N.Y.S.2d 842, 517 N.E.2d 520 (1987), which discourage the use of showup identifications because of their highly suggestive nature. It is true that showup identifications have been the subject of sharp criticism: "[T]he most grossly suggestive identification procedure now or ever used by the police." Patrick M. Wall, *Eye–Witness Identification in Criminal Cases* 28 (1965). Their use has been discouraged absent exigent circumstances. 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 7.4(f), at 590 (1984) ("In particular, showups should be deemed to violate due process absent the most imperative circumstances.").

20. New Mexico has for years permitted showup identifications, even though highly suggestive, as long as the identification is deemed reliable under the totality of the circumstances. *Maes,* 100 N.M. at 82, 665 P.2d at 1173; *Torres,* 88 N.M. at 575, 544

P.2d at 290. For example, the showup may be highly suggestive, as it was with Defendant alone in the back of the police car after police had already implied he was the man. But suggestiveness alone may be inconsequential. Many victims of assault, for example, have an indelible impression of the suspect's likeness—one they may never forget— and therefore a court could well overlook even an unfairly suggestive showup if the identification was reliable under the totality of the circumstances. *See Manson v. Brathwaite,* 432 U.S. 98, 110–14, 97 S.Ct. 2243, 2251–53, 53 L.Ed.2d 140 (1977) (listing factors for court to weigh in determining overall reliability of a suggestive showup identification); *Neil v. Biggers,* 409 U.S. 188, 200–01, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972) (holding rape victim had clear look at assailant's face, and therefore showup was permissible even though conducted seven months later under suggestive circumstances).

21. Here, however, the showup identification does not seem to bear the same indicia of reliability. The witness never testified to having seen Defendant's face—only his clothing. With Defendant spotlighted in the back of a police car, the witness was led to believe this was the man before he ever saw him. When the witness confronted that same man at trial, albeit in different clothes, he could not identify him. Under the totality of these circumstances, the showup identification may have had questionable reliability. In this instance, Defendant might have had a meritorious motion to suppress the showup identification. We will assume that to be the case, without deciding so, and we will further assume that effective counsel would have raised the matter at an appropriate time before the witness was allowed to testify about the showup before the jury. However, even assuming all the foregoing, Defendant still would not prevail.

22. As part of a prima facie showing of ineffective assistance of counsel, Defendant must show that competent actions by his counsel would likely have altered the outcome of the trial. *State v. Gonzales,* 113 N.M. 221, 229–30, 824 P.2d 1023, 1031–32 (1992); *State v. Robinson,* 99 N.M. 674, 679, 662 P.2d 1341, 1346, *cert. denied,* 464 U.S.

851, 104 S.Ct. 161, 78 L.Ed.2d 147 (1983); *State v. Ernesto M.*, 121 N.M. 562, 915 P.2d 318 (Ct.App.1996), *cert. denied,* 121 N.M. 444, 913 P.2d 251 (1996); *State v. Scott,* 113 N.M. 525, 531, 828 P.2d 958, 964 (Ct.App.1991), *cert. quashed,* 113 N.M. 524, 828 P.2d 957 (1992). Defendant has not carried his burden on this point. Defendant was caught with the stolen property during the time frame and in the vicinity of the burglary, exactly when and where the witness indicated the burglar would be. In light of evidence this compelling, we conclude that the witness's identification of Defendant, whether in or out of court, was merely cumulative. Defendant had no defense to the most damaging evidence of all. More effective action by defense counsel to defuse the identification would not have changed that fact. While we recognize that one cannot be convicted of burglary based upon possession alone, *State v. Aragon,* 109 N.M. 632, 637, 788 P.2d 932, 937 (Ct.App.), *cert. denied,* 109 N.M. 563, 787 P.2d 1246 (1990), it is also true that evidence of possession may be buttressed by other circumstantial evidence linking the suspect with the theft. There does not have to be a positive eyewitness identification. Here, the conjunction of time and location was persuasive corroborating evidence upon which a jury could reasonably rely to convict. Therefore, without a showing of prejudice, we decline to reverse this conviction on the grounds of ineffective assistance of counsel.

*CONCLUSION*

23. Based on the foregoing analysis, we affirm the convictions below.

24. IT IS SO ORDERED.

FLORES and BUSTAMANTE, JJ., concur.